Monique SCOTT, Plaintiff,

v.

SHOE SHOW, INCORPORATED, et al., Defendants.

Civil Action No. 1:12–CV–3286–TWT.

United States District Court, N.D. Georgia, Atlanta Division.

Signed Aug. 14, 2014.

---

Nathaniel J. Middleton, Nathaniel J. Middleton, Attorney at Law, Decatur, GA, for Plaintiff.

John R. Hunt, Stokes Wagner Hunt Maretz & Terrell, Atlanta, GA, for Defendants.

## ORDER

THOMAS W. THRASH, JR., District Judge.

This is an employment discrimination action. It is before the Court on the Report and Recommendation [Doc. 35] of the Magistrate Judge recommending granting the Defendants' Motion for Summary Judgment [Doc. 32]. The Plaintiff was fired for stealing merchandise from her employer. The Court approves and adopts the Report and Recommendation as the judgment of the Court. The Defendants'

1. Scott filed this action against Shoe Show, Kevin Broome ("Broome"), and Brenda Greser ("Greser"), alleging discrimination, hostile work environment, and retaliation under Title VII and the ADA; discrimination and retaliation under the Georgia Equal Employment for Persons with Disabilities Code ("Georgia Disability Code"), O.C.G.A. § 34–6A–1 et seq.; and intentional infliction of emotional distress. [Doc. 1]. However, on April 15, 2013, Scott's claims against Broome and Greser were dismissed, as were her claims alleging retaliation under Title VII and the ADA, violation of the Georgia Disability Code, and intentional infliction of emotional distress, [Doc. 9]; see also [Doc. 7]. Therefore, only Scott's claims against Shoe Show alleging discrimination and hostile work environment under Title VII and the ADA remain in .this case.

2. The listed document and page numbers in citations to the record in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF, with the exception of deposition transcripts, which are also cited according to the transcript page number.

Motion for Summary Judgment [Doc. 32] is GRANTED.

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

RUSSELL G. VINEYARD, United States Magistrate Judge.

Plaintiff Monique Scott ("Scott") brings this action against defendant Shoe Show, Inc. ("Shoe Show"), alleging claims of discrimination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.[1] See [Doc. 1].[2] Shoe Show seeks summary judgment, [Doc. 32],[3] which Scott opposes, [Doc. 33].[4] For the following reasons, it is **RECOMMENDED** that Shoe Show's motion for summary judgment, [Doc. 32], be **GRANTED**.

3. Shoe Show filed its brief in support of its summary judgment motion on November 14, 2013, [Doc. 31], and inadvertently included only page one of its motion for summary judgment. [Id. at 1]. However, Shoe Show filed its complete motion for summary judgment the following day. See [Doc. 32].

4. In Shoe Show's reply in support of its summary judgment motion, it requests that the Court strike Scott's response as untimely and deem its summary judgment motion unopposed. [Doc. 34 at 1–2]. Shoe Show filed its motion for summary judgment on November 15, 2013, [Doc. 32], and Scott's response in opposition was therefore due on December 9, 2013. However, Scott did not file her response until December 16, 2013, and she failed to request additional time to file her response or otherwise offer any reasons for the untimely filing. Thus, the Court could disregard the untimely response, but it will consider Scott's response in ruling on the pending motion, and notes that its "consideration does not alter the Court's analysis or its conclusion." Hegre v. Alberto–Culver USA, Inc., 508 F.Supp.2d 1320, 1327 (S.D.Ga. 2007).

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *Preliminary Procedural Issues*

In compliance with Local Rule 56.1B(1), Shoe Show, as movant, filed a statement of material facts as to which there is no genuine issue to be tried. [Doc. 31–1]. Scott was required to submit a response under Local Rule 56.1B(2)a, but she failed to do so. Specifically, Local Rule 56.1B(2) requires the non-moving party to include with the responsive brief "[a] response to the movant's statement of undisputed facts[] ... [that] contain[s] individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts." LR 56.1B(2)a(1), NDGa.; *see also Linao v. GCR Tire Ctrs.*, Civil Action No. 2:09–CV–134–RWS, 2010 WL 4683508, at *2 (N.D.Ga. Nov. 12, 2010). If the non-moving party fails to respond to a material fact contained in the moving party's statement by directly refuting the fact with concise responses supported by specific citations to evidence, stating a valid objection to the admissibility of the fact, pointing out that the movant's citation does not support the movant's fact, or showing that the movant's fact is not material, the fact will be deemed admitted. *See* LR 56.1B(2)a(2), NDGa.; *BMU, Inc. v. Cumulus Media,*

*Inc.*, 366 Fed.Appx. 47, 49 (11th Cir.2010) (per curiam) (unpublished). Accordingly, the factual statements contained in Shoe Show's statement of material facts as to which there is no genuine issue to be tried, [Doc. 31–1], are deemed admitted. Nevertheless, the Court has disregarded those facts that are not material, are supported by a citation to a pleading rather than to evidence, or are stated as issues or legal conclusions, *see* LR 56.1B(1)-(2), NDGa., and the facts will be construed in the light most favorable to Scott as required on a motion for summary judgment, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir.2003) (per curiam).

### B. *Statement of Facts*

Shoe Show is a retailer of footwear and accessories that operates retail stores in 38 states, including Georgia. [Doc. 31–3 (Manning Decl.) ¶ 3].[5] Scott, an African–American, was employed as a Sales Associate at Shoe Show's retail store in Stockbridge, Georgia, from August of 2008 until August of 2010, and again from February of 2011 until September of 2011. [Doc. 28 (Pl.'s Dep.) at 29 p. 29, 32–33 pp. 32–33, 39 p. 39, 41–43 pp. 41–43].[6]

---

5. As part of its company policies and procedures, Shoe Show adopted an Equal Opportunity and Nonharassment Policy to promote equal employment opportunities and prohibit discrimination on the basis of disability and other protected characteristics. [Doc. 31–3 ¶ 4]. This policy also prohibits retaliation and provides Shoe Show employees with a telephone number they can use to make complaints about workplace discrimination, harassment, or retaliation. [*Id.*]; *see also* [*id.* at 6]. Employees receive a copy of this policy when they are hired, and Shoe Show also posts a copy of the policy in each of its stores. [*Id.* ¶ 5].

6. Scott voluntarily resigned her employment with Shoe Show in August of 2010 in order to become a full-time student at Gordon College in Barnesville, Georgia. [Doc. 28 at 38–39 pp. 38–39]. Prior to leaving for college, Scott wrote a letter of resignation, without any assistance, and provided it to Shoe Show. [*Id.*]; *see also* [Doc. 28–3 at 1]. Scott reapplied for employment with Shoe Show in February of 2011, and after completing a job application on her own without assistance, Shoe Show rehired her. [Doc. 28 at 41–43 pp. 41–43]; *see also* [Doc. 28–4]. Throughout Scott's employment with Shoe Show, she knew and understood the company policy prohibiting disability discrimination, and a copy of the policy was posted on the wall in the Stock-

When Scott returned to Shoe Show in 2011, she took several written tests based on materials contained in the company manual, a copy of which was maintained at the store. [*Id.* at 44–45 pp. 44–45]. The tests covered topics such as sales, service, and shoplifting. [*Id.* at 46 p. 46]. Scott received a perfect score on each test. [*Id.* at 45–53 pp. 45–53]. Scott also took and signed a "Greeting Test & Employer–Employee Agreement," which, among other things, stated, "I understand and agree ... I will not allow anyone to take merchandise and not report it." [*Id.* at 54 p. 54; Doc. 28–7]. Scott understood that this was the company policy throughout her employment with Shoe Show and that she could be terminated from her employment with Shoe Show for violating this policy. [Doc. 28 at 55–56 pp. 55–56].[7] In addition, Scott read and understood Shoe Show's Money Policy, which she signed to acknowledge her receipt and understanding of when she returned to work at Shoe Show in February of 2011, [*id.* at 56–58 pp. 56–58; Doc. 28–8], and she acknowledged that she had taken and passed the test regarding Shoe Show's theft policy, which was in place throughout Scott's employment with Shoe Show, [Doc. 28 at 50–56 pp. 50–56].

As a Sales Associate with Shoe Show, Scott's job duties included greeting customers, assisting customers in finding certain shoes or the correct shoe size, stocking the store's shelves, operating the computerized cash register, and completing a sale, which involved accepting various forms of payments from customers. [*Id.* at 33–36 pp. 33–36, 62–63 pp. 62–63]. Scott did not experience any difficulties in performing her job duties, and she did not request, nor did she require, any sort of accommodation in order to perform these duties. [*Id.* at 37 p. 37, 63–64 pp. 63–64]. Scott believed that her job performance was good. [*Id.* at 36 p. 36, 64 p. 64].[8]

On August 31, 2011, Broome, Shoe Show's Loss Prevention Investigator, conducted an investigation of the Stockbridge store due to the corporate office's concern regarding the high number of refunds being authorized at that store. [Doc. 29 (Broome Dep.) at 18 p. 17, 114–15 pp. 113–14; Doc. 31–3 ¶ 7]. Broome interviewed four employees at the store, including Scott. [Doc. 29 at 46 p. 45; Doc. 31–3 ¶ 7]. Prior to interviewing Scott, Broome provided her with an Interview Acknowledgment form,[9] which she read aloud and then signed. [Doc. 28 at 67–68 pp. 67–68; Doc.

---

bridge store during both of her periods of employment. [Doc. 28 at 59–60 pp. 59–60]: Scott also understood that she could use the telephone number provided to complain about workplace discrimination or harassment. [*Id.* at 60 p. 60].

**7.** Scott also understood that her employment with Shoe Show was at-will and that she could be terminated by the company for any reason. [Doc. 28 at 31 p. 31].

**8.** In fact, throughout her periods of employment with Shoe Show, Scott never told anyone that she had a disability, nor did she request an accommodation in order to perform her job. [Doc. 28 at 37 p. 37, 64 p. 64]. Moreover, Scott never used the telephone number provided in Shoe Show's Equal Op-

portunity and Nonharassment Policy to complain or ask questions regarding any aspect of her employment. [*Id.* at 60 p. 60].

**9.** The form provides in relevant part as follows:

> I agree to participate in the interview at this time, with the above-named interviewer. I understand that I am free to leave at any time during the interview. Any information I provide to the interviewer will be provided to the office of the Director of Human Resources.
>
> Further, I acknowledge that refusal to cooperate or be truthful during this interview may be grounds for my immediate termination.
>
> [Doc. 28–11].

28–11].[10] Broome's interview of Scott consisted entirely of oral questions and answers, and Scott was not asked to read, review, or comment upon any other documents during her interview other than the Interview Acknowledgment form. [Doc. 28 at 70–71 pp. 70–71]. During the interview, Scott admitted that she had allowed friends and family members to take shoes from the store without paying for them. [Doc. 29 at 35 p. 34]; *see also* [Doc. 28–12].[11]

Broome took notes during the interview and specifically wrote down statements made by Scott. [Doc. 28 at 76 p. 76; Doc. 28–12]. In particular, Broome quoted Scott as saying, "I first started doing it by Nov. 2008"; "[t]he last time was by July 2011"; the "most I gave a way in one month = 10 pairs [and] I averaged at least 5 per month"; "I know it's at least 100"; "27 months × 5 pairs of shoes per month = 135 pairs of shoes"; "Average pair cost = $39.98 to 49.28"; "I didn't care if they did it"; "I would give them the [coast] is clear [and] let them take shoes[.] I just didn't care"; and "[t]hey were schoolmates, friends, relatives [and] neighbors[.] The word just got out that I would hook

up." *See* [Doc. 28–12]. Scott reviewed these notes, wrote on the left side margin of the notes that "[t]he notes right true and I do own the money," [sic] and she then signed her name and dated it as August 30, 2011. [*Id.*]; *see also* [Doc. 28 at 76–80 pp. 76–80].[12]

Scott also wrote a letter to the company dated August 30, 2011, which states in pertinent part as follows:

I have set down [sic] with [Broome] and told him everything. I'm sorry for letting my friends and family come in[ ]to the store and [steal]. I wasn't trying to hurt the company. I know in the 27 months of working 135 [pairs] of shoe[s] were [taken] and the cost of the shoe[s] were $5,397.30.[ ] I was just try [sic] to help friends and family out. By turn[ing][ ] my back and giv[ing] them the sign that it was ok. They t[a]ken the shoe [sic] and left. I[ ] didn't make any money of[f] the shoe. By tell [sic] you this I give you my word that it will never happen [ ] again. I know what can happen [ ] to me [i]f it does.

[Doc. 28 at 81 p. 81; Doc. 28–13]. Broome left the room while Scott prepared this

---

10. Aside from "stumbl[ing] over a couple of words in the document," Scott had no problems reading the form. [Doc. 28 at 68–69 pp. 68–69]. Scott testified that she told Broome that she was "getting ready to be tested for a disability, [her] learning disability comprehension[.]" [*Id.* at 68 p. 68]; *see also* [Doc. 28–16 at 5 (Scott's Equal Employment Opportunity Office ("EEOC") Intake Questionnaire in which she wrote that she told Broome that she "had a reading problem and was getting tested for it.") ]. However, Broome testified that Scott's reading of the form was typical of most individuals he interviews and that he "didn't see anything out of the unusual with what [Scott] had done," despite her explanation to him that she was not a "good reader." [Doc. 29 at 23–24 pp. 22–23]. Scott also testified that she understood that she was free to leave the interview at any time. [Doc. 28 at 70 p. 70].

11. Scott testified that she only admitted to allowing her friends and family members to take shoes from the store because she felt Broome was "backing [her] into a corner and [she] was trying to save [her] job at the time." [Doc. 28 at 75 p. 75]; *see also* [*id.* at 73–74 pp. 73–74 (explaining that she admitted to allowing people to steal shoes from the store "[b]ecause [Broome] kept backing [her] into a corner and kept questioning [her] about stuff that [she] told him [she] didn't know anything about.") ].

12. Scott admitted that she reviewed and signed the notes, but she testified that she signed them because Broome "kept backing me into a corner and saying that the simple fact that if I knew people were stealing, then it was basically me stealing." [Doc. 28 at 76 p. 76].

statement. [Doc. 28 at 83 p. 83; Doc. 29 at 41 p. 40].[13] When Broome returned, Scott read her statement aloud in the presence of Broome and Greser, Shoe Show's District Manager, who supervises the operations of 14 Shoe Show stores/including the Stockbridge store. [Doc. 30 (Greser Dep.) at 16 p. 15; Doc. 28 at 83–84 pp. 83–84]. Scott did not have any difficulty reading the statement to Broome and Greser, and she testified that she understood the meaning of her statement. [Doc. 28 at 84 p. 84; Doc. 30 at 59 p. 58].

At the conclusion of the interview, Scott signed a Counseling Conference memorandum in which she acknowledged that she had allowed other individuals to take over $5,000 worth of shoes from the store without paying for them. [Doc. 28 at 84–86 pp. 84–86; Doc. 28–14]. In the section titled "Employee comments," Scott wrote, "I agree to the give away shoe, [sic] I'm sorry and I will never let it happen again." [Doc. 28–14].[14] Subsequently, J.W. Manning ("Manning"), a supervisor of the loss prevention and human resources depart-

ments of Shoe Show, made the decision to terminate Scott's employment based on her admission that she had allowed others to take merchandise from the store without payment in violation of the company's loss prevention policies, and he communicated this decision to Scott in a Separation Report dated September 6, 2011. [Doc. 31–3 ¶¶ 2, 10–11]; see also [id. at 9].[15]

Following her termination from Shoe Show, Scott underwent a psychological evaluation on October 20, 2011, with Valerie McAdams, Psy.D. ("Dr. McAdams"), of Premier Psychological Center, Inc., based on a referral from the Georgia Department of Vocational Rehabilitation. [Doc. 28 at 92 p. 92; Doc. 31–12 at 9–13]. During the evaluation, Dr. McAdams administered several standard psychological tests, interviewed Scott, and then diagnosed her with an unspecified learning disorder, with a need to rule out a reading disorder. See [Doc. 31–12 at 9–13].[16]

On February 15, 2012, Scott filed a Charge of Discrimination ("Charge") with

---

**13.** Scott testified that although Broome left the room while she prepared the statement, that Broome told her what to write in the statement and that the words in the statement were "his wording." [Doc. 28 at 82–83 pp. 82–83].

**14.** Scott testified that Broome was not intimidating to her, that he never raised his voice or yelled at her, that he did not threaten her in any way, that he was never rude to her, and that he acted "fairly friendly" during the interview. [Doc. 28 at 72–73 pp. 72–73, 131 p. 131, 146 p. 146]. During the interview, Scott did not request any sort of accommodation. [Id. at 37 p. 37, 64 p. 64]. Broome and Greser both testified that at the time of the interview, they were unaware that Scott had any disability. [Doc. 29 at 66 p. 65, 105 p. 104; Doc. 30 at 90–91 pp. 89–90].

**15.** Shoe Show has terminated the employment of other employees for allowing other individuals to take merchandise from its stores without paying. [Doc. 31–3 ¶ 11].

**16.** Dr. McAdams concluded that Scott "should be able to work in a variety of areas without real difficulty," but that "some modifications may be required due to her poor reading/spelling deficits." [Doc. 31–12 at 12]. She also concluded that Scott would "take much longer in understanding written instructions as opposed to verbal instructions," but that "[o]nce directions [were] explained ... she [was] not expected to have problems understanding or completing job tasks" and would need "only minor supervision if any, based on cognitive ability." [Id.]. Further, Dr. McAdams concluded that Scott was not "expected to have interpersonal difficulty within a work setting," that "[e]motional issues [were] not expected to be a significant factor in working ability," and that she was "able to understand, remember, and follow simple as well as complicated and detailed instructions that are *verbally* explained, but [would] have difficulty reading and understanding complex information." [Id.].

the EEOC, alleging discrimination based on her disability that took place between August 30, 2011, and September 6, 2011. [Doc. 28–17; Doc. 28 at 105–06 pp. 105–06]. Specifically, she alleged as follows:

I. I began employment with the above-named employer in or around February of 2011 as a Sales Clerk and Cashier. My employer knew or should have known that I am a person with a disability. On August 30, 2011, I was interrogated regarding theft at the store. During the interrogation, I was denied the reasonable accommodation of verbal communication and additional time to process the questions asked of me. That same day, I was suspended.

On September 6, 2011, I was discharged.

II. The reason provided for the suspension was that "they had to determine whether or not to discharge me." The reason provided for the discharge was violation of loss prevention policy.

III. I believe that I have been discriminated against because of my disability in violation of Title I of the [ADA].

[Doc. 28–17].[17] On June 22, 2012, the EEOC issued its Dismissal and Notice of Right to Sue to Scott. [Doc. 28–19].[18] On September 20, 2012, Scott filed the instant complaint, [Doc. 1], and following the dismissal of certain claims, *see* [Docs. 7 & 9], Shoe Show now moves for summary judg-

**17.** On May 21, 2012, an investigator with the EEOC sent Scott's attorney a letter in which he reported in relevant part:

Please be advised that I have been assigned to investigate the above-referenced charge of employment discrimination filed by your client, [ ] Scott, against Shoe Show, the Respondent. In [ ] Scott's charge she asserts that she was denied a reasonable accommodation, suspended, and discharged because of her disability in violation of Title I of the [ADA].
Based on the information obtained thus far, evidence would not likely suggest that the Respondent violated the ADA:
● The Respondent was not advised that [ ] Scott was a person with a disability until after she admitted—both verbally and in writing—to assisting family and friends in stealing merchandise from the Respondent.
● Even if the Respondent had reason to believe [ ] Scott was a person with a disability, the Respondent communicated with [ ] Scott in the most effective manner, verbally. Thus, [ ] Scott was accommodated.
● There is no evidence to date that Respondent's proffered reason for discharge—theft—was a pretext for discriminatory or retaliatory motive. There is no direct evidence and there is no indirect evidence.

Based on the foregoing information and pursuant to the Commission's Priority Charge Handling Procedures, it is likely that the Commission will discontinue its processing of the referenced charge and issue your client a Notice of Dismissal and Right to Sue . . . .
[Doc. 28–18 (emphasis omitted)].

**18.** On May 30, 2013, Scott saw Gary Santavicca, Ph.D. ("Dr. Santavicca"), for a second psychological evaluation. [Doc. 28 at 97 p. 97]. Dr. Santavicca diagnosed Scott with attention deficit hyperactivity disorder ("ADHD") and social phobia. [*Id.* at 98–101 pp. 98–101, 117–18 pp. 117–18]. Scott testified that this was the first time she had been diagnosed with either of these conditions. [*Id.* at 100–01 pp. 100–01]. Scott also produced documents to the EEOC and in discovery in this action, including her high school record that noted that she was "comfortable advocating for herself" and that she recognized that her "determination, resilience, and resourcefulness [were] also strengths." [Doc. 31–14 at 11–12]. Finally, Scott did not request any sort of accommodation at the deposition, and she acknowledged having read the complaint and her EEOC Charge in preparation for the deposition. [Doc. 28 at 7–8 pp. 7–8].

ment on all of Scott's remaining claims, [Doc. 32], which Scott opposes, [Doc. 33]. The pending motion is now ripe for ruling.[19]

## II. STANDARD

In deciding a motion for summary judgment, the Court views all evidence in the light most favorable to and draws all reasonable inferences in the favor of the non-moving party. *Gray v. City of Jacksonville, Fla.,* 492 Fed.Appx. 1, 3 (11th Cir. 2012) (per curiam) (unpublished) (citations omitted). "Summary judgment shall be granted if the movant shows that there is 'no genuine issue as to any material fact', such that the movant is entitled to judgment as a matter of law." *Jerome v. Barcelo Crestline, Inc.,* 507 Fed.Appx. 861, 863 (11th Cir.2013) (per curiam) (unpublished) (*quoting* Fed.R.Civ.P. 56(a)); *see also Holmes v. Ga. ex rel. Strickland,* 503 Fed.Appx. 870, 872–73 (11th Cir.2013) (per curiam) (unpublished) (citations omitted); *Young v. FedEx Express,* 432 Fed.Appx. 915, 916 (11th Cir.2011) (per curiam) (unpublished) (citation omitted); *Gaylor v. Greenbriar of Dahlonega Shopping Ctr., Inc.,* 975 F.Supp.2d 1374, 1382 (N.D.Ga. 2013).

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material facts, upon which the non-moving party must then submit specific facts showing a genuine issue for trial. Fed. R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gaylor,* 975 F.Supp.2d at 1382; *Premier Assocs., Inc. v. EXL Polymers, Inc.,* No. 1:08–cv–3490–WSD, 2010 WL 2838497, at *8 (N.D.Ga. July 19, 2010) (citations omitted). "[A]

party opposing a properly supported motion for summary judgment may not rest upon mere allegation[s] or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Jackson v. B & L Disposal, Inc.,* 425 Fed.Appx. 819, 820 (11th Cir.2011) (per curiam) (unpublished) (first alteration in original) (citation and internal marks omitted); *see also Shuler v. Ingram & Assocs.,* 441 Fed.Appx. 712, 715 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted); *Bryant v. U.S. Steel Corp.,* 428 Fed.Appx. 895, 897 (11th Cir.2011) (per curiam) (unpublished) (citation omitted).

"Speculation or conjecture cannot create a genuine issue of material fact." *Shuler,* 441 Fed.Appx. at 715 (citation omitted); *see also Howard v. Or. Television, Inc.,* 276 Fed.Appx. 940, 941 (11th Cir.2008) (per curiam) (unpublished) (citation omitted); *Goodman v. Ga. Sw.,* 147 Fed.Appx. 888, 891 (11th Cir.2005) (per curiam) (unpublished) (citation and internal marks omitted) ("All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable."). "Moreover, the non-moving party cannot create a genuine issue through evidence that is 'merely colorable' or 'not significantly probative.'" *Morales v. Ga. Dep't of Human Res.,* 446 Fed.Appx. 179, 181 (11th Cir.2011) (per curiam) (unpublished) (citation omitted). That is, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Gaylor,* 975 F.Supp.2d at 1382 (citation and internal

---

**19.** Additional facts will be set forth below as they become necessary for discussion of Scott's claims.

marks omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Anyanwu v. Brumos Motor Cars, Inc.*, 496 Fed.Appx. 943, 945–46 (11th Cir.2012) (per curiam) (unpublished) (citation and internal marks omitted), and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving party is proper," *Premier Assocs., Inc.*, 2010 WL 2838497, at *9 (alteration in original) (citation and internal marks omitted).

## III. DISCUSSION

Shoe Show moves for summary judgment on Scott's remaining claims of discrimination and a hostile work environment under Title VII and the ADA, [Doc.

32], which Scott opposes in part, [Doc. 33].[20] Shoe Show's motion is due to be granted for the following reasons.

## A. *Exhaustion of Administrative Remedies and Scope of EEOC Charge*

■ "Before filing suit under Title VII . . ., a plaintiff must exhaust the available administrative remedies by filing a charge with the EEOC." *Anderson v. Embarq/Sprint*, 379 Fed.Appx. 924, 926 (11th Cir.2010) (per curiam) (unpublished) (citations omitted); *see also Edwards v. Nat'l Vision Inc.*, No. 13–12876, 568 Fed.Appx. 854, 859, 2014 WL 2611192, at *4 (11th Cir. June 12, 2014) (per curiam) (unpublished) (citation omitted); *Francois v. Miami Dade Cnty., Port of Miami*, 432 Fed.Appx. 819, 821 (11th Cir.2011) (per curiam) (unpublished); *Poulsen v. Publix Super*

---

**20.** Scott's claims for failure to accommodate under the ADA and a hostile work environment, to the extent she has even properly asserted these claims, *see generally* [Doc. 31-2]; *see also* [Doc. 1], may be summarily addressed since she failed to respond to Shoe Show's arguments regarding these claims, or otherwise address them in any way, and they are therefore deemed abandoned. *See Brooks v. Ins. House, Inc.*, 322 Fed.Appx. 782, 784 n. * (11th Cir.2009) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) (citations omitted) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Chandler v. Volunteers of Am., N. Ala., Inc.*, Civil Action No. 10–S–2961–NW, 2013 WL 832133, at *21 (N.D.Ala. Feb. 28, 2013) (dismissing plaintiff's retaliation and hostile work environment claims "due to her failure to offer any meaningful argument in opposition to defendant's motion for summary judgment on those claims"); *Orquiola v. Nat'l City Mortg. Co.*, 510 F.Supp.2d 1134, 1139 (N.D.Ga.2007) (granting summary judgment as to plaintiff's state law claims because plaintiff did not re-

spond to defendant's summary judgment motion); *Burnette v. Northside Hosp.*, 342 F.Supp.2d 1128, 1140 (N.D.Ga.2004) (plaintiff's failure to address a challenged claim on summary judgment warranted dismissal of that claim); *Bute v. Schuller Int'l, Inc.*, 998 F.Supp. 1473, 1477 (N.D.Ga.1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); *Welch v. Delta Air Lines. Inc.*, 978 F.Supp. 1133, 1137 (N.D.Ga.1997) ("Plaintiff's failure to respond to [d]efendant's argument alone entitles [d]efendant to summary judgment on these claims."). Accordingly, it is hereby **RECOMMENDED** that summary judgment be **GRANTED** in favor of Shoe Show and against Scott as to Scott's claims for failure to accommodate under the ADA and a hostile work environment. In addition, Scott failed to address Shoe Show's arguments regarding her Title VII claims, *see* [Doc. 31-2 at 3–4 (arguing that Scott failed to exhaust her administrative remedies by filing a Charge with the EEOC encompassing her Title VII claims, and that she has failed to assert any cognizable claim under Title VII)]; however, to the extent she is still maintaining her discrimination claim under Title VII, *see generally*, [Doc. 33], the Court will address it, as well as her discrimination claim under the ADA.

*Mkts., Inc.,* 302 Fed.Appx. 906, 907 (11th Cir.2008) (per curiam) (unpublished); *Canty v. Fry's Elecs., Inc.,* 736 F.Supp.2d 1352, 1372 (N.D.Ga.2010), adopted at 1364. Prior to filing a private civil action under Title VII, a plaintiff must timely file a charge of discrimination "within one hundred and eighty days after the alleged unlawful employment practice occurred[.]" 42 U.S.C. § 2000e–5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Gay v. AirTran Airways, Inc.,* 427 Fed. Appx. 743, 745 (11th Cir.2011) (per curiam) (unpublished).[21] "If an employee fails to file an EEOC charge before the 180–day limitations period elapses, [her] subsequent lawsuit is procedurally barred and must be dismissed for failure to exhaust [her] administrative remedies." *Maxwell v. Inner Harbour, Ltd.,* Civil Action No. 1:08–CV–2925–RWS, 2009 WL 1045478, at *2 (N.D.Ga. Apr. 20, 2009) (*citing Brewer v. Alabama,* 111 F.Supp.2d 1197, 1204 (M.D.Ala.2000)).

■ Although a plaintiff's failure to include allegations of a particular type of discrimination or discriminatory act in an EEOC charge does not necessarily preclude a judicial complaint based on such allegations, "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970)[22] (*quoting King v. Ga. Power Co.,* 295 F.Supp. 943, 947 (N.D.Ga.1968)); *see*

*also Anderson,* 379 Fed.Appx. at 926; *Chanda v. Engelhard/ICC,* 234 F.3d 1219, 1225 (11th Cir.2000); *Dickey v. Crawford Cnty. Sch. Dist.,* Civil Action No. 5:10–cv–356 (CAR), 2011 WL 482716, at *3 (M.D.Ga. Feb. 7, 2011) (citations omitted). The EEOC's investigatory function lies at the heart of the statutory scheme for remedying employment discrimination. *Smith v. Sentry Ins.,* 674 F.Supp. 1459, 1467 (N.D.Ga.1987); *see also Freeman v. Koch Foods of Ala.,* 777 F.Supp.2d 1264, 1276 (M.D.Ala.2011). Consequently, "the actual investigation triggered by the EEOC charge [is] the primary factor determining the permissible scope of a judicial complaint of employment discrimination." *Smith,* 674 F.Supp. at 1467.

■ "When considering the extent of a reasonable investigation by the EEOC, courts begin with the EEOC charge itself, with a particular focus on the factual statement contained therein." *Freeman,* 777 F.Supp.2d at 1277 (citation omitted). That is, "[c]laims that amplify, clarify, or more clearly focus earlier complaints are appropriate, but allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate." *Gay,* 427 Fed.Appx. at 745 (citations and internal marks omitted). A judicial complaint, however, may include any allegations investigated by the EEOC, even if the investigation was broader than the EEOC charge triggering the investigation because the EEOC has had the opportunity to effect voluntary compliance with

---

**21.** "The 180 day filing period begins to run from the date the adverse employment decision is communicated to the employee." *Barnes v. Hillhaven Rehab. & Convalescent Ctr.,* 686 F.Supp. 311, 312 (N.D.Ga.1988) (*citing Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981); *Del. State Coll. v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). The same is true even if

the decision does not take effect until after the communication. *Ricks,* 449 U.S. at 258, 101 S.Ct. 498.

**22.** Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

the law prior to the filing of a civil action. *Smith*, 674 F.Supp. at 1467; *see also Montgomery v. Atlanta Family Rests., Inc.*, 752 F.Supp. 1575, 1580 (N.D.Ga. 1990), adopted at 1576–77 (holding that claims in the plaintiff's complaint which were not specifically alleged in her EEOC charge but which were part of the EEOC's investigation were reasonably related to the conduct alleged in the formal EEOC charge). Finally, "where a defendant in a Title VII ... discrimination case asserts that the plaintiff has not satisfied all conditions precedent to filing suit, including, for example, the timely filing of an EEOC Charge, the plaintiff bears the burden of proving that the conditions precedent ... have been satisfied...." *Jackson v. Meadwestvaco Coated Bd., Inc.*, No. 3:09–cv–695–MEF, 2010 WL 4000614, at *5 (M.D.Ala. Sept. 22, 2010), adopted by 2010 WL 3999084, at *1 (M.D.Ala. Oct. 12, 2010) (second and third alterations in original) (citations and internal marks omitted); *Kerr v. McDonald's Corp.*, 333 F.Supp.2d 1352, 1358 (N.D.Ga.2004).

■ Scott identified disability discrimination in violation of the ADA as the sole basis of her EEOC Charge. *See* [Doc. 31–9 at 3]. Specifically, Scott marked discrimination based on disability as the reason for her claim, and alleged that she had "been discriminated against because of [her] disability in violation of Title I of the [ADA]." [*Id.*]. Scott's complaint, however, alleges discrimination based on her disability in violation of Title VII and the ADA, among other things.[23] *See* [Doc. 1]. Shoe Show contends that to the extent Scott is attempting to assert any claims under Title VII, they are barred because she failed to include these claims in her EEOC Charge. [Doc. 31–2 at 3–4]. Upon review, the Court finds that the EEOC Charge does indeed fail to state or even suggest allegations of discrimination under Title VII against Shoe Show.

Shoe Show has also attached Scott's EEOC Intake Questionnaire which shows that the only box marked on this form is the disability box. *See* [Docs. 31–7 & 31–8]. Furthermore, a letter to Scott's attorney from the EEOC investigator indicates that the EEOC only investigated Scott's claims that she was "denied a reasonable accommodation, suspended, and discharged because of her disability in violation of Title I of the [ADA]." *See* [Doc. 28–18 at 1]. In considering all of the documents properly before the Court, it is clear that nothing in Scott's filings with the EEOC even mentions discrimination based on a characteristic protected under Title VII or reflects an intention to pursue any Title VII claims against Shoe Show, *see Chanda*, 234 F.3d at 1224–25, and the substance of the EEOC Charge was clearly limited to disability discrimination in violation of the ADA, [Doc. 31–9 at 3]. Furthermore, after liberally construing the EEOC Charge, the Court concludes that discrimination claims based on a protected characteristic under Title VII could not reason-

---

**23.** Scott testified that she was not accusing Shoe Show of discriminating against her on the basis of her race, color, religion, sex, or national origin, but that she was only accusing Shoe Show of disability discrimination. *See* [Doc. 28 at 107 p. 107]. "Title VII makes it unlawful for an employer to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

*Harris v. Potter's House Family & Children Treatment Ctr.*, No. 1:13–cv–2563–WSD, 2013 WL 5436775, at *1 (N.D.Ga. Sept. 27, 2013) (citation and internal marks omitted). That is, "Title VII does not proscribe disability discrimination, nor does it give protected status to disabled persons." *Id.* (citations and internal marks omitted). Thus, Scott's Title VII claims based on her alleged disability are due to be dismissed for this additional reason.

ably be expected to "grow out of" the EEOC investigation. *See Francois*, 432 Fed.Appx. at 821; *Ramon v. AT & T Broadband*, 195 Fed.Appx. 860, 865–66 (11th Cir.2006) (per curiam) (unpublished). Scott's EEOC Charge factually supports only claims of disability discrimination under the ADA. Thus, the EEOC could not reasonably have been expected to investigate any claims arising under Title VII, *see Hillemann v. Univ. of Cent. Fla.*, 167 Fed.Appx. 747, 749–50 (11th Cir.2006) (per curiam) (unpublished) (affirming district court's dismissal of plaintiff's Title VII race, sex, and retaliation claims where EEOC charge factually supported only an age discrimination failure to hire claim), and in fact, it appears that the EEOC did not investigate any such claims, *see* [Doc. 28–18].

Based on the evidence before the Court, the EEOC did not receive notice of or investigate any claims under Title VII against Shoe Show. Because any such claims are not reasonably related to the allegations presented at the administrative level, they exceed the scope of the EEOC complaint and investigation. *See Canty*, 736 F.Supp.2d at 1362 (finding plaintiff had failed to exhaust administrative remedies as to race discrimination claims, among others, that were not even suggested by the EEOC charge, which only mentioned ADEA claims relating to a vacation request and scheduling grievance); *Sessom v. Wellstar Hosp.*, Civil Action File No. 1:08–CV–2057–TWT, 2009 WL 1562876, at *3 (N.D.Ga. May 29, 2009), adopted at *1 (finding disability discrimination claim not reasonably expected to grow out of EEOC charge, which only

referenced discrimination on the basis of sex and retaliation); *Baldwin v. Harris Cnty.*, Civil Action No. H–04–3822, 2005 WL 6457562, at *2–3 (S.D.Tex. Nov. 15, 2005) (dismissing plaintiff's Title VII claims where EEOC charge referred only to the ADA and there was no reasonable expectation that the EEOC would investigate discrimination claims based on race or national origin). Thus, to the extent Scott attempts to assert claims against Shoe Show under Title VII, the claims are barred for failure to exhaust her administrative remedies. *See Hernandez v. Mohawk Indus., Inc.*, No. 6:08–cv–927–Orl–28GJK, 2009 WL 3790369, at *4 (M.D.Fla. Nov. 10, 2009) (citations omitted) (finding plaintiff's claim of age discrimination could not reasonably be expected to grow out of an investigation on his charge of disability discrimination, stating, "[s]uch assertions by discrimination plaintiffs who seek to add totally unrelated forms of discrimination in court after filing a charge on a different basis have been repeatedly rejected in this circuit."). Accordingly, it is hereby **RECOMMENDED** that Shoe Show's motion for summary judgment with regard to Scott's Title VII claims be **GRANTED.**[24]

### B. ADA Claims

Scott alleges that Shoe Show discriminated against her on the basis of her disability in violation of the ADA. *See* [Doc. 1]. "Title I of the ADA specifically addresses discrimination in the employment context," *Marsh v. Ga. Dep't of Behavioral & Health Developmental Disabilities*, No. CV410–273, 2011 WL 806423, at *2 n. 9

---

**24.** Because Scott has failed to exhaust her administrative remedies with respect to her Title VII claims, the Court need not address the merits of these claims. *Pierri v. Cingular Wireless, LLC*, 397 F.Supp.2d 1364, 1374 & n. 3 (N.D.Ga.2005), adopted at 1368; *see also*

*Franceschi v. U.S. Dep't of Veterans Affairs*, 514 F.3d 81, 86–87 (1st Cir.2008); *Miller v. Sw. Bell Tel. Co.*, 51 Fed.Appx. 928, 2002 WL 31415083, at *6 (5th Cir.2002) (per curiam) (unpublished).

(S.D.Ga. Feb. 14, 2011), adopted by 2011 WL 806658, at *1 (S.D.Ga. Mar. 2, 2011), and provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

42 U.S.C. § 12112(a).

■ Where, as here, there is no direct evidence of discrimination, "[t]he burden-shifting analysis of Title VII employment discrimination claims is applicable to [Scott's] ADA claims." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir.2000) (per curiam) (citation omitted); *see also Jest v. Archbold Med. Ctr., Inc.*, 561 Fed. Appx. 887, 889 (11th Cir.2014) (per curiam) (unpublished) (citation omitted) ("We analyze ADA discrimination claims under the burden-shifting analysis applied to Title VII claims."). Thus, a plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a prima facie case. *Chancey v. Fairfield S. Co.*, 949 F.Supp.2d 1177, 1183 (N.D.Ala. 2013); *see also Gilliard v. Ga. Dep't of Corr.*, 500 Fed.Appx. 860, 866–67 (11th

Cir.2012) (per curiam) (unpublished). If Scott "is able to advance a prima facie case of [discrimination], the burden then shifts ... to [Shoe Show] to articulate legitimate, non-discriminatory reasons for the alleged [discriminatory] acts." *Robinson v. Rock-Tenn CP, LLC*, 986 F.Supp.2d 1287, 1311 (N.D.Ala.2013) (citation omitted).[25] "Once [Shoe Show] articulates such a reason, [Scott] must demonstrate that [Shoe Show's] proffered explanation is a pretext for [discrimination] for her claim to survive summary judgment." *Id.* (citation omitted); *see also Corzine v. Little League Baseball Inc.*, Civil Action No. 5:12–CV–405 (CAR), 9 F.Supp.3d 1364, 1370, 2014 WL 1159625, at *4 (M.D.Ga. Mar. 21, 2014).

■ In order to succeed on a claim under the ADA, Scott must show that: "(1) [s]he is disabled; (2) [s]he was a qualified individual at the relevant time, meaning [s]he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) [s]he was discriminated against [or suffered an adverse employment action][26] because of [her] disability." *Puckett v. Bd. of Trs. of First Baptist Church of Gainesville*, Civil Action No. 2:13–CV–00131–RWS, 17 F.Supp.3d 1339, 1342, 2014 WL 1572748, at

**25.** Shoe Show's burden, one of production and not of persuasion, is "exceedingly light." *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir.1988); *see also Bagwell v. Peachtree Doors & Windows, Inc.*, Civil Action File No. 2:08–CV–191–RWS–SSC, 2011 WL 1497831, at *21 (N.D.Ga. Feb. 8, 2011), adopted by 2011 WL 1497658, at *1 (N.D.Ga. Apr. 19, 2011) (citation omitted). "It is not necessary that the court believe the evidence; the court's analysis can involve no credibility assessment." *Matthews v. City of Dothan*, No. 1:04–CV–640–WKW, 2006 WL 3742237, at *5 (M.D.Ala. Dec. 18, 2006) (citation and internal marks omitted). "So long as the employer articulates 'a clear and reasonably specific' non-discriminatory basis for its actions, it has discharged its burden of production." *Vessels*

*v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 770 (11th Cir.2005) (per curiam) (citation omitted).

**26.** With regard to the alleged adverse employment actions, the Eleventh Circuit has "clarified that 'not all conduct by an employer negatively affecting an employee constitutes adverse employment action.' " *Embry v. Callahan Eye Found. Hosp.*, 147 Fed.Appx. 819, 828 (11th Cir.2005) (per curiam) (unpublished) (*quoting Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir.2001)). However, Scott clearly suffered an adverse employment action when she was terminated from her employment.

*2 (N.D.Ga. Apr. 17, 2014) (footnote added) (internal marks omitted) (*quoting Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir.2001)); *see also Moore v. Jackson Cnty. Bd. of Educ.*, 979 F.Supp.2d 1251, 1258–59 (N.D.Ala.2013). In short, Scott must show that she is an "individual with a disability" against whom Shoe Show discriminated. 42 U.S.C. § 12112(a).

### 1. *Prima facie* Case

Shoe Show concedes for purposes of its motion that Scott has a disability as defined by the ADA. *See* [Doc. 31–2 at 6 n. 4]. Shoe Show, however, argues that Scott has failed to show that it was aware of her disability, that her disability was in any way connected to her termination, or that her termination arose out of circumstances that raise an inference of discrimination. [*Id.* at 6–12]. The undersigned finds that Scott has failed to establish a prima facie case of disability discrimination based on her termination because she has not shown that Shoe Show knew she had a disability at the time it took adverse action.[27]

Shoe Show argues that Scott has failed to establish a prima facie case of discriminatory discharge based on her disability because there is no evidence that anyone at Shoe Show, much less the decisionmaker, had actual knowledge of her disability at the time she was interviewed regarding the thefts and subsequently terminated. *See* [Doc. 31–2 at 6–9; Doc. 34 at 2–3]. The Court agrees.

 "It is well established in this Circuit that 'a decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee because of that disability.'" *Williamson v. Clarke Cnty. Dep't of Human Res.*, 834 F.Supp.2d 1310, 1322–23 (S.D.Ala.2011) (citation and internal marks omitted) (*quoting Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir.2005)). "Simply put, an employee cannot be fired because of a disability unless the decisionmaker has actual knowledge of that disability." *Id.* at 1323 (emphasis, citation, and internal marks omitted). That is, mere constructive knowledge of a disability is insufficient. *See id.* (*citing Cordoba*, 419 F.3d at 1185). Therefore, "as part and parcel of [her] *prima facie* showing, [Scott] must come forward with evidence from which a reasonable factfinder could conclude that [Shoe Show or the decision-maker, Manning] had actual knowledge of [her] disability." *Id.; see also Rogers v. CH2M Hill, Inc.*, 18 F.Supp.2d 1328, 1336 (M.D.Ala.1998) (citation and internal marks omitted) ("[P]roving discrimination under the ADA requires that an employee must show that the employer knew of such employee's substantial physical or mental limitation.").

 It is undisputed that throughout both periods of her employment with

---

**27.** The prima facie case is not discussed in detail because the issues are intertwined with the question of pretext and the Court finds that Scott has failed to create a genuine issue of material fact regarding pretext. *See Morrison v. City of Bainbridge, GA*, 432 Fed.Appx. 877, 881 n. 2 (11th Cir.2011) (per curiam) (unpublished) (citation omitted) ("[W]hen an employer has offered a legitimate, nondiscriminatory reason for an [alleged adverse employment action], whether a plaintiff made out a prima facie case is almost always irrelevant in considering a motion for summary judgment."); *see also Smith v. Fed. Express Corp.*, 191 Fed.Appx. 852, 856 (11th Cir.2006) (per curiam) (unpublished); *Musgrove v. Gov't of the Dist. of Columbia*, 775 F.Supp.2d 158, 169 (D.D.C.2011) (citation omitted) ("[W]hen considering a motion for summary judgment in an employment discrimination case, a district court need not consider whether a plaintiff has actually satisfied the elements of a prima facie case if the defendant has offered a legitimate, non-discriminatory reason for its actions.").

Shoe Show, Scott never advised anyone that she had a disability, nor did she ever request an accommodation for her disability in order to be able to perform her job. *See* [Doc. 28 at 37 p. 37, 64 p. 64]. In fact, Scott testified that she had no difficulties performing any of her job duties, *see* [*id.* at 37 p. 37, 63–64 pp. 63–64], and both Broome and Greser testified that they had no knowledge that Scott suffered from any sort of disability at the time of her interview regarding the theft of merchandise, *see* [Doc. 29 at 66 p. 65, 105 p. 104; Doc. 30 at 90–91 pp. 89–90]. Although Scott maintains that she advised Broome during the interview that she was "getting ready to be tested for a disability, [her] learning disability comprehension" and that she "had a reading problem and was getting tested for it," *see* [Doc. 28 at 68 p. 68; Doc. 28–16 at 5; Doc. 29 at 23–24 pp. 22–23], "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent," *Howard v. Steris Corp.*, 550 Fed.Appx. 748, 751 (11th Cir.2013) (unpublished) (alteration in original) (emphasis, citation, and internal marks omitted), and the mere fact that an individual may be illiterate does not necessarily mean that the individual is "suffering from a physical or mental impairment," *Morisky v. Broward Cnty.*, 80 F.3d 445, 448 (11th Cir.1996) (per curiam) (citation omitted).[28] Indeed, "[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA," *id.*, and in the present case, Scott's alleged learning disability was not so obvious that Shoe Show should have known even though she told no one of it. In fact, Scott testified that she was able to perform her job without any accommodations and she even completed all paperwork and tests required for her position as a Sales Associate, as well as read aloud, provided a written statement, and answered oral questions at the interview. *See* [Doc. 28 at 36–39 pp. 36–39, 41–58 pp. 41–58, 63–64 pp. 63–64, 67–68 pp. 67–68, 70–71 pp. 70–71, 76–86 pp. 76–86; Doc. 30 at 16 p. 15, 59 p. 58; Docs. 28–3, 28–4, 28–7, 28–8, 28–11, 28–12, 28–13, & 28–14]. "Simply put, the ADA does not require clairvoyance," and "[a]sking the employer to guess ... is asking too much of the employer, and of the ADA." *Rogers*, 18 F.Supp.2d at 1337 (citation and internal marks omitted).[29]

---

**28.** However, "[t]here is room under the ADA for an employee to argue that [her] disability was so obvious that the employer did know about the disability." *Rogers*, 18 F.Supp.2d at 1336. Generally, "[t]he paradigm of the case where the disability would be known without direct employee notification would be the example of a wheelchair-bound employee." *Id.*

**29.** In her response in opposition, Scott asserts that she has ADHD and that her ADHD "qualified as a disability and limited her ability to think, concentrate, and reason." [Doc. 33 at 3]. Scott, however, was not diagnosed with ADHD until May 30, 2013, *see* [Doc. 28 at 97–101 pp. 97–101, 117–18 pp. 117–18], which was well after her termination in September of 2011, [Doc. 31–3 ¶ 10]. Scott's "post-termination notification is [ ] of no effect, simply because it is post-termination." *Rogers*, 18 F.Supp.2d at 1335 n. 5. That is, "[s]imple logic requires the conclusion that because the employer 'did not know of [plaintiff's] disability until after her employment was terminated, it would have been impossible for the company to have made that disability the basis for the termination." *Id.* (second alteration in original) (citations and internal marks omitted); *see also Van Compernolle v. City of Zeeland*, No. 1:05–CV–133, 2006 WL 1460035, at *10 (W.D.Mich. May 24, 2006) (citations and internal marks omitted) ("Considering that [plaintiff] did not discover that he had ADHD, bipolar disorder, and depression until after his termination, it would be quite impossible for him to have informed [defendant] of his disability before he was fired" and an "employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability.").

More important, there is absolutely no evidence that Manning, the ultimate decision-maker in this case, knew of any alleged disability, *see Ezzard v. Eatonton–Putnam Water & Sewer Auth.*, Civil Action No. 5:11–CV–505 (CAR), 2013 WL 5438604, at *5 (M.D.Ga. Sept. 27, 2013) (alteration in original) (emphasis, footnote, and internal marks omitted) (noting that a plaintiff's claims could not "succeed unless the employee's protected trait actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome."), and Manning averred that his decision to terminate Scott's employment was solely based on her violation of company policy, *see* [Doc. 31–3 ¶ 11]. Because the undisputed evidence reveals that Shoe Show had no knowledge of Scott's disability prior to terminating her employment, summary judgment is due to be granted in favor of Shoe Show on Scott's ADA discrimination claim on this basis alone. *See Andrews v. United Way of Sw. Ala., Inc.*, No. CIV. A. 98–1142–P–C, 2000 WL 210694, at *7 (S.D.Ala. Jan. 26, 2000).[30]

### 2. *Legitimate, Non–Discriminatory Reason & Pretext*

Even if the Court assumed for purposes of Shoe Show's motion that Scott could establish a prima facie case, her discrimination claim would still fail because she has not shown that Shoe Show's proffered legitimate, non-discriminatory reason for her termination was a pretext for discrimination. Specifically, Shoe Show explained that it terminated Scott based on her admission that she had allowed other individuals to take merchandise from the store in clear violation of the company's loss prevention policies. *See* [Doc. 31–3 ¶¶ 8–11].

Because this explanation constitutes a legitimate, non-discriminatory reason for the alleged employment decision at issue, *see McCoy v. Geico Gen. Ins. · Co.*, 510 F.Supp.2d 739, 752 (M.D.Fla.2007) (plaintiff's violations of company policies constitutes legitimate, nondiscriminatory reason for his termination under the ADA), the onus is on Scott to prove by a preponderance of the evidence that the reason provided by Shoe Show is a pretext for prohibited, discriminatory conduct, *See Price v. Facility Mgmt. Grp., Inc.*, 403 F.Supp.2d 1246, 1260–61 (N.D.Ga.2005).

To demonstrate pretext, Scott's evidence must reveal " 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.' " *Maples v. UHS of Ga., Inc.*, 716 F.Supp.2d 1266, 1274 (N.D.Ga.2010) (*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997)). Scott may prove pretext by "either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004) (citations omitted); *see also Shuford v. City of Montgomery*, Civil Action No. 2:10cv203–WHA–WC (WO), 2011 WL 1375297, at *5 (M.D.Ala. Apr. 12, 2011). Thus, Scott may create an issue of fact at the pretext stage by (1) presenting evidence that Shoe Show's proffered reason is not worthy of

---

**30.** Having found that Scott has failed to meet this element of her prima facie case, and because Shoe Show has proffered a legitimate, non-discriminatory reason for its action, the Court need not address Shoe Show's arguments concerning the remaining elements of a prima facie case of disability discrimination.

belief, thereby enabling the jury to infer that discrimination was its real reason, or (2) presenting evidence that discrimination was, in fact, Shoe Show's real reason. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

 "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Tolley v. United Parcel Serv.,* No. Civ.A.1:05CV606TWT, 2006 WL 486523, at *5 (N.D.Ga. Feb. 27, 2006) (citations and internal marks omitted). "Thus, the inquiry is limited to whether the employer offered an honest, [non-discriminatory] explanation for terminating the employee, regardless of whether the decision might have been mistaken." *Id.* (citations omitted). "Ultimately, an employee must meet the employer's stated reason 'head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason.'" *Young,* 432 Fed.Appx. at 917 (citation omitted).

 Scott has failed to adequately address Shoe Show's legitimate, nondiscriminatory reason for its action, *see generally* [Doc. 33], much less show that it was pretextual, *see Crawford v. City of Fairburn, Ga.,* 482 F.3d 1305, 1308 (11th Cir.2007) (plaintiff must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, or the employer is entitled to summary judgment); *Chapman v. AI Transport,* 229 F.3d 1012, 1024–25 (11th Cir.2000) (same). Scott "cannot establish pretext by simply demonstrating facts that suggest [discriminatory] animus, but must specifically respond to each of the employer's explanations and rebut them." *Burgos–Stefanelli v. Sec'y, U.S. Dep't of*

*Homeland Sec.,* 410 Fed.Appx. 243, 247 (11th Cir.2011) (per curiam) (unpublished) (citation omitted). "If the plaintiff fails to demonstrate that there is a genuine issue of material fact concerning whether the employer's articulated reasons for the adverse employment action are pretextual, then the employer is entitled to summary judgment on the [discrimination] claim." *Johnson v. Advertiser Co.,* 778 F.Supp.2d 1270, 1277 (M.D.Ala.2011) (citing *Combs,* 106 F.3d at 1528). Furthermore, "[t]his Court need not cull through the materials . . . searching for evidence which creates a disputed issue where [p]laintiff has provided no direction." *Maitland v. Employease, Inc.,* No. Civ.A.1:05–CV–0661–, 2006 WL 3090120, at *12 (N.D.Ga. Oct. 13, 2006), adopted at *1.

Scott argues, without any supporting citations to evidence in the record, that her admission and written statement was "given under duress" and that she was coerced into providing a confession. *See* [Doc. 33 at 2, 4]. However, "[m]ere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment." *Savage v. Ga. Dep't of Transp.,* Civil Action No. 1:10–CV–2459–TWT–GGB, 2011 WL 7063360, at *3 (N.D.Ga. Dec. 27, 2011), adopted by 2012 WL 161887, at *1 (N.D.Ga. Jan. 19, 2012) (citation and internal marks omitted). Indeed, "[b]y failing to present significant probative evidence on th[is] issue to avoid summary judgment, [Scott] does not meet [her] burden of establishing pretext for discrimination." *Taylor v. Teakdecking Sys., Inc.,* No. 8:11–CV–02709–T–24–TGW, 2013 WL 1437741, at *7 (M.D.Fla. Apr. 9, 2013) (citation and internal marks omitted); *see also Holifield v. Reno,* 115 F.3d 1555, 1564 n. 6 (11th Cir.1997) (per curiam) (citations omitted) ("[C]onclusory assertions . . . in the absence of supporting

evidence, are insufficient to withstand summary judgment.").[31]

Furthermore, the Eleventh Circuit has held:

If an employer discharges an individual under an honest belief pursuant to the information ·available to the employer that the employee has violated a policy of the employer, the fact that the employer's belief may be mistaken or wrong in fact does not mean that such belief cannot constitute a legitimate reason for the employer's discharge of the plaintiff.

*Smith v. PAPP Clinic, P.A.*, 808 F.2d 1449, 1452 (11th Cir.1987). "Here, nothing in the record usurps [Shoe Show's] contention that [it] honestly believed [Scott] violated [its] policies." *King v. Augusta, Ga.*, No. CV 106–148, 2008 WL 268913, at *8 (N.D.Ga. Jan. 29, 2008) (citation omitted). "The Court will not second-guess [Shoe Show's] assessment[ ] and ultimate decision; [the Court is] not interested in whether the conclusion is a correct one, but whether it is an honest one." *King v. Butts Cnty., Ga.*, 939 F.Supp.2d 1310, 1329 (M.D.Ga.2013) (footnote and internal marks omitted). "In the end, the issue in this lawsuit is not whether [Scott] actually committed a . . . violation, or whether any violation should have been excused . . . [; t]he issue is whether [Scott] was terminated because [Shoe Show] believed that [s]he had committed a violation. Even a mistaken, unfairly arrived at belief that an employee committed a[ ] violation does not suggest discrimination." *Goode v. Wings of Alpharetta, Inc.*, Civil Action No. 1:11–CV–1337–WSD–JSA, 2013 WL 997669, at *15 (N.D.Ga. Jan. 18, 2013), adopted by

2013 WL 997558, at *5 (N.D.Ga. Mar. 13, 2013) (citation omitted). Because Scott has essentially failed to address Shoe Show's argument or present any rebuttal evidence to Shoe Show's legitimate, non-discriminatory reason, she has failed to create any genuine issue with regard to pretext. *See Morrison*, 432 Fed.Appx. at 881; *Burgos–Stefanelli*, 410 Fed.Appx. at 247; *Odum v. Gov't Emps. Ins. Co.*, 405 Fed.Appx. 396, 396 (11th Cir.2010) (per curiam) (unpublished); *Jenkins v. J.C. Penny, Inc.*, Civil Action No. CV107–034, 2009 WL 2524499, at *3 (S.D.Ga. Aug. 17, 2009). Accordingly, it is **RECOMMENDED** that Shoe Show's motion for summary judgment on Scott's ADA claim be **GRANTED.**

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Shoe Show's motion for summary judgment, [Doc. 32], be **GRANTED** in its entirety.

The Clerk is **DIRECTED** to terminate this referral.

**IT IS SO RECOMMENDED** and **DIRECTED** this 26th day of June, 2014.

---

31. Moreover, Scott's own testimony belies her assertion that her confession was coerced in some way since she stated that Broome was not intimidating to her, that he never raised his voice or yelled at her, that he did not threaten her in any way, that he was never rude to her, and that he acted "fairly friendly" during the interview. [Doc. 28 at 72–73 pp. 72–73, 131 p. 131, 146 p. 146].